IN THE

# SUPREME COURT of JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### AT NOVEMBER TERM, 1865.

EUPHEMIA HARRISON, ADMINISTRATRIX OF PHILIP HAR-
RISON, DECEASED, v. THE CENTRAL RAILROAD COMPANY.

1. A master who has used due diligence in the selection and employment
of his servants, is not responsible for an injury done to one of them
by the carelessness of another, in the course of their common employ-
ment.
2. A railroad company are responsible to an employee for all damages
resulting from their own misconduct; but to warrant a recovery, the
fault or misconduct must be that of the company themselves and not
simply the negligence of a fellow servant.
3. An employer contracts with his employee to use reasonable diligence
to protect him from unnecessary risks; and for the omission of such
diligence, which is equivalent to negligence or want of care, he will
be answerable to the action of such employee for all the damages that
may ensue.

The declaration in this case contained three counts. The
first was to the effect following, viz., that the defendants were
the owners and proprietors of a railroad bridge in the town-
ship of Greenwich, in the county of Warren, the same being
a part of their railroad; that Philip Harrison, deceased, in

his lifetime, was in the service and employ of the defendants in the capacity of brakeman. The count then proceeded in these words: "And it then and there became and was the duty of the said defendants to provide, have, maintain, and keep over and across the said Musconetcong creek, at the point where the said railroad so crosses the said creek, a good, strong, safe, and secure bridge, &c., and to have, keep up, and maintain the same in good condition." The breach is in these words, viz., "yet the said defendants not regarding their duty in that behalf, behaved and conducted themselves so wrongfully, negligently, and improperly, that by and through the gross carelessness, wrongful acts, neglect, and default of the said defendants and their servants, who then and there had the oversight, supervision, and care of the said defendants' said railroad bridge, in having, keeping, and maintaining, and in then and there using the said railroad bridge, knowing the said bridge to be unsafe, defective, and weak and insecure, and in a bad and dangerous condition, and wholly unfit for the purpose of safely and securely carrying and conveying and bearing the weight and burthen of the said railroad trains, cars, carriages, and locomotive engines, having to go and run over, upon, and across the same, as aforesaid, &c." The count then concluded with a statement that the bridge being in the condition above described, broke down with a train, on which the said Philip Harrison was a brakeman, and that he was thereby killed within twelve calendar months next before the commencement of the suit, &c.

The other two counts were substantially the same as the first, with the exception that they did not contain any allegation that the defendants had knowledge of the unsafe condition of the bridge above mentioned. There was also an averment at the close of the declaration, that the plaintiff brought her suit for the benefit of herself, as the widow of the said Philip Harrison, and certain persons named as next of kin, &c.

To this declaration there was a general demurrer.

For plaintiff, *J. F. Dumont* and *D. A. Depue.*

For defendants, *Attorney-General.*

The opinion of the court was delivered by

THE CHIEF JUSTICE. The first count of the declaration in this case discloses that the defendants, who are a railroad company, were aware that one of the bridges on the line of their road was out of repair and was unsafe; that they ran a train of cars, heavily loaded, over it while in this condition, and that it consequently gave way, occasioning the death of the husband of the plaintiff. That these facts would constitute a ground of action in favor of a stranger to the company is not denied, but it is insisted they do not have that effect with regard to one of their own employees. The person who lost his life by the accident above mentioned was a brakeman in the employ of the defendants, and this suit is brought by his administratrix in conformity with the statute making provision for the recovery of damages in cases where death is caused by a wrongful act. *Nix. Dig.* 211.* The case raised on this demurrer, therefore, presents for consideration, in one of its aspects, the doctrine which is of but recent development, how far and in what mode the general rule that a party is answerable for his neglects which are injurious to another, is modified by the circumstance that the relationship of employer and employee exists between the doer of the wrong and him who is affected by it. That this relationship must materially and in many respects restrict the rights of the servant and diminish the responsibility of the master, has been already settled by repeated decisions of courts whose opinions are possessed of every title to respect.

The demurrer to the declaration in this case appears to have been intended to raise the question, whether the defendants are responsible to one of their employees, for damages resulting from their carelessness or neglect in keeping their bridge in repair.

That a master who has used due care in the selection and

* *Rev.*, p. 294.

employment of his servants, is not responsible for an injury done to one of them by the carelessness of another in the course of their common employment, may now be regarded as a rule of law completely established. For this subject has already received, on the part of the judiciary, that thoroughness of discussion and exhaustive consideration which its importance so eminently demanded; and the conclusion arrived at is sustained by a concurrence of judicial opinion seldom occurring, when the application of ancient principles is so entirely novel, and the subject to be affected is one of the ordinary relations of business life. Prominent among these cases thus referred to is that of *Farwell* v. *Boston and Winchester Railroad Corporation*, 4 *Met.* 49, in which Chief Justice Shaw examines this question, and in an argument of great force and clearness, places, as it seems to me, the non-responsibility of the master on the most stable foundation. The suit was brought by an engineer against the company for an injury received by him, while running the cars in the course of his duty, in consequence of the carelessness of the switch-tender, who was careful and trusty in his general character. In the solution of the problem thus before them the court resorted to general principles, and were thus led to the conclusion that the duties of the master and the correlative rights of the servant are altogether the creatures of the contract, express or implied, which exists between them. And it was accordingly held that the servant, when he undertakes to perform any particular service, assumes, as a part of his conventional obligations, the ordinary perils which, in the nature of things, are incident to such service. The argument was put upon the grounds, that the servant was as likely to know, and could as effectually guard against these perils as the master; that they were such as could be distinctly foreseen and as well provided for in the rate of compensation as any others; that where several persons are employed in the prosecution of a common enterprise, each of such persons has a supervision over the conduct of the others and can give notice of any misconduct, carelessness, or neglect.

These considerations induced to the result that the servant stipulated to encounter, at his own risk, the dangers to be apprehended from the carelessness of his fellow servant, and that he, consequently, could not claim from his employer indemnification for any loss occasioned by such cause. Most of the other authorities adopt the same general principle. *Priestly* v. *Fowler*, 3 *M. & W.* 1; *Couch* v. *Steel*, 3 *Ellis & Black.* 402; *Wigmore* v. *Jay*, 5 *Excheq.* 352; *Seymour* v. *Maddox*, 16 *Adolph. & El. N. S.* 327; *Hutchinson* v. *The York, New Castle, and Berwick R. W. Co.*, 5 *Excheq.* 343.

It will be perceived that the guide to the conclusion reached in these cases was the contract which the law, from the relation of master and servant and on grounds of public policy, implies to exist between them; and, as it seems to me, the solution of the present question is to be obtained, and without difficulty, by a reference to the same criterion. Was it the understanding of the parties to the contract to hire and to serve, in the present case, that the company, as to their servant, were to be exempt from responsibility for their own neglect and want of care?

The first consideration which naturally arises on an examination of this proposition is, that the hazard, which it is insisted the servant agreed to incur, is not, so far as the master is concerned, one necessarily inherent in the business. It appears but just and fair and every way reasonable, that the servant should agree to take upon himself the usual perils of the employment, and over which the party whom he serves has no control. He knows that there will be risk from the want of skill or from the inadvertence and neglect of those associated with him in the conduct of the common business; but these dangers are the necessary, inseparable concomitants of the employment, and there is, certainly, every appearance of justice in the legal implication, that as to injuries arising from such causes, over which his employer possesses no power, and for the effects of which he is not morally responsible, they shall be borne by the servant. But upon what plausible pretence can it be said, that the

servant consents to abide the consequences of his employer's neglect? The misfeasances of his fellow servants are, as between himself and his employer, the inalienable incidents of the thing undertaken, while it would be hardly admissible for a master to predicate that an injury to the servant, arising from his own want of care, was one of the necessary consequences of the servant's employment. The only view consistent with reason is, that the servant undertakes to bear the risks naturally attendant on the business he assumes, and both sound morals and common justice forbid the master to allege, that one of those risks is the probability of his own default. Carelessness, which works an injury to another, is, in the eye of the law, civil misconduct; and a stipulation that a party shall have the privilege of committing such misconduct with impunity, will not be incorporated into a contract by intendment. Every rational implication is opposed to the existence of such an understanding. The claim to such exemption is inconsistent with morality and public policy, so much so, indeed, that it might be somewhat questionable whether, if such contract existed in point of fact and by express stipulation, it would not be, on that account, void. The facts of the present case exhibit, in a striking point of view, the exorbitance of the proposition claiming immunity for the consequences to the servant, of the master's negligence. The demurrer, in this case, admits that the servant lost his life by reason of want of care in the master, that is, that the latter was guilty of the commission of a grave misdemeanor. It would be singular indeed if the law, in annexing incidents to the relationship of master and servant, should clothe the former with the privilege to commit this criminal act, so far as the private rights of the servant are concerned, with impunity. If the rights of the parties, then, are to be regulated on the basis of a contract, in my opinion, upon the plainest rules of law, the defendants were responsible to their employee for all damage which was the product of their own misconduct.

Nor will this result, as it seems to me, be varied if we

consider this matter on the broader ground of general convenience and public security. That the master should be careful in the conduct of a business to which peril to life attaches, is important not only to the servant, but, in an equal degree, to the community also. It is of public interest, therefore, that no motive to the exercise of care on the part of the principal mover of such business should be taken away or impaired, and this would be the effect of declaring him irresponsible for his negligence to his employee. It is also of moment, that those who are employed in carrying out the details of an undertaking which is at all hazardous, should have an interest in observing and detecting the lapses of those at the head of such business ; for it is, in most cases, impracticable for such subordinates to protect themselves against the consequences of such misconduct without, at the same time, contributing something to the safety of the citizens at large. The interest of the servant to bring to light the neglects and omissions of duty of the employer should be coincident with that of the community. All considerations of welfare to the public, therefore, seem to lead to the same result as that reached by an examination of the contract which the law implies from the connection of master and servant.

And in favor of the same view will be found the body of the cases heretofore decided. Indeed, even in most of the decisions which exonerate the master from the consequences of the injury done to one servant by the carelessness of another, the doctrine is generally accompanied with assumptions or intimations that, for hurtful results from his own omission of a reasonable and proper care, the master would be responsible to his servant. Thus in *Tarrant* v. *Webb*, 37 *E. L. & Eq. R.* 281, both the principle of the master's responsibility to his servant, when in default himself, and his exemption when the default is that of another servant, is forcibly exemplified—for it was there held that if a master use reasonable precautions and efforts to procure safe and skillful servants, but without fault, happen to have one in

his employ through whose incapacity damage occurs to a fellow servant, the master is not liable. And in *Noyes* v. *Smith*, 28 *Vt.* 59, the principle to be settled in this case was presented for consideration, and the decision, sustained by great weight of argument, was in favor of the liability of the master to the servant for the consequence of the culpable negligence of the former. The most recent case upon this subject is that of *Snow* v. *Housatonic Railroad Company*, 8 *Allen* 441, in which the same view of the responsibilities of the master is taken; and although the general reasoning which led the court to that result appears to me to be correct, yet it is proper that I should say, that I do not altogether concur with some parts of the opinion in which the liability of the master is carried to such an extent, as practically to abrogate the rule which exempts him from responsibility to his servant, for injuries occasioned by the faults of a fellow servant.

On the whole, therefore, on principle as well as upon the decided weight of authority, I conclude that an employer contracts with his employee to use reasonable diligence to protect him from unnecessary risks, and that, for the omission of such diligence, which is equivalent to negligence or want of care, he will be answerable to the action of such employee for all the damages which may ensue.

To apply, then, the foregoing doctrine to the pleadings contained in this record.

I think it clear that, in strictness, in all the counts the duty of the company to keep up and maintain the bridge in question, is laid down or averred in a form much too broad and unqualified. From the relation between the company and their brakeman, the legal consequence seems to have been deduced by the pleader that the former, with regard to the latter, was bound to keep the bridge in a safe condition. This is not a true statement of the obligation of the company. It was not near so absolute; for if the bridge was insecure from a secret defect which the company was not able to discern by the exercise of reasonable diligence and skill, no

Harrison v. Central Railroad Co.

responsibility would have fallen on the defendants on account of its defective state. If, as was stated on the argument, the company, in point of fact, directed its agents, who were possessed of competent skill, to examine at stated periods the bridge in question, and such agents reported to the company that the structure was in a secure condition, and no circumstances existed which were calculated to impair a reasonable confidence in such report, I think it is plain, upon the principles of law above propounded, that even if the agents making such report acted carelessly in the discharge of their duties, or even falsely reported their conclusions to the company, that under such a state of facts the plaintiff could not sustain this suit. To warrant a recovery in this case in favor of the employee, who is here represented by the plaintiff, the fault which forms the basis of the action, must be that of the company and not simply the negligence of a fellow servant. And in that point of view it is, that the duty of the defendants is set out in too general a manner in the various counts. But notwithstanding this defect, as in the first count there is an explicit charge that the unsafe condition of the bridge was known to the defendants themselves, I think a legal liability is sufficiently shown. The other counts allege carelessness in the defendants in general terms, omitting to charge a scienter with regard to the state of the bridge, and in the case of *Wigmore* v. *Jay*, 5 *Excheq.* 354, a similar form of pleading appears to have been considered sufficient. But as the effect of sustaining the first count will be to overrule the demurrer, that being general to the whole declaration, it is not necessary to express any opinion on the legal propriety of these other counts.

Judgment should be in favor of the plaintiff on the record as it now stands, with leave, &c.

CITED in *McAndrews* v. *Burns*, 10 *Vroom* 120; *Paulmier, Adm'r*, v. *Erie R. R. Co.*, 5 *Vroom* 153.